SAUL SARKA, a Minor, by and through Mary Sarka, his Mother and Next Friend, *et al.*, Plaintiffs-Appellants, v. RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER *et al.*, Defendants-Appellees.—SAUL SARKA, a Minor, by and through Mary Sarka, his Mother and Next Friend, *et al.*, Plaintiffs-Appellants, v. MELVIN GERBIE *et al.*, Defendants-Appellees.

First District (2nd Division)   Nos. 1—89—2145, 1—89—2173 cons.

Opinion filed November 30, 1990.—Rehearing denied February 5, 1991.

David A. Novoselsky & Associates and O'Callaghan & Associates, P.C., both of Chicago (David A. Novoselsky and Joseph Michael O'Callaghan, of counsel), for appellants.

Arnstein & Lehr and Steven H. Jesser, of Northwestern Memorial Hospital, both of Chicago (Arthur L. Klein, Fredrick J. Entin, Miles J. Zaremski, and Richard C. Gering, of counsel), for appellees.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

In this medical malpractice action, plaintiff claims that due to the negligence of defendant hospital and pediatricians he suffers from injuries allegedly sustained during his birth. Contesting the claim, defendants seek to examine plaintiff. Pursuant to Supreme Court Rule 215 (87 Ill. 2d R. 215), the trial court entered an order compelling plaintiff to submit to a physical examination including magnetic resonance imaging (MRI) or computed axial tomography (CT) scan under sedation by chloral hydrate. Plaintiff refused to comply with the order on the ground that the MRI or CT scan posed a risk of harm; the trial judge held plaintiff's mother, Mary Sarka, and his attorneys in contempt. From these orders, contemnors appeal raising the issue of whether the trial court abused its discretion in ordering plaintiff to submit to a CT scan under sedation by chloral hydrate.

On February 2, 1977, Saul Sarka was born at Northwestern Memorial Hospital. He was delivered by Melvin Gerbie, M.D., and during the delivery there was no evidence of fetal distress, nor were any problems noted during Saul's mother's pregnancy. However, Saul was born severely depressed with only a feeble heart beat. In addition, immediately after birth the attendant medical personnel noted that Saul had a peculiar facial appearance, and a chromosome analysis was recommended. During the chromosome analysis no abnormalities were found and the cause of Saul's problems was diagnosed as birth asphyxia.

After Saul was discharged from the hospital, Peter Huttenlocher, M.D., examined him. Dr. Huttenlocher noted Saul's unusual appearance and neurological dysfunction, and stated that he believed those disabilities may have resulted from congenital conditions preceding the moment of birth rather than complications at birth.

On October 30, 1980, a lawsuit was filed on behalf of Saul by his mother and next friend, Mary Sarka, against Northwestern Memorial Hospital and Dr. Melvin Gerbie.[1] The complaint averred that Saul's injuries resulted from the negligence of defendants during Saul's birth and that as a result of such negligence Saul suffers from severe and permanent brain damage.

On June 30, 1983, pursuant to Supreme Court Rule 215, defendant Northwestern Memorial Hospital motioned to compel Saul to sub-

---

[1]Dr. Melvin Gerbie has settled with plaintiff since the taking of this appeal. He has been dismissed from this action by the trial court and is not a party to this appeal.

mit to a blood test. That motion was denied without prejudice by Judge O'Brien on July 20, 1983.

Defendants again made a discovery motion on February 6, 1984, to compel Saul to submit to the taking of photographs. On March 12, 1984, Judge O'Brien granted the motion. The order granting defendants' motion stated in part that "medical personnel or therapists shall be present to insure the safety and security of the plaintiff." On April 11, 1984, plaintiff filed a motion to vacate the order claiming that the positioning of Saul for the photographs was likely to cause him pain, terror, and other adverse psychological effects. At the hearing to determine whether the order should be vacated, Judge O'Brien stated that the photographs would be taken only in accordance with the directions of plaintiff's therapist: "[I]f the therapist says I cannot open up [Saul's] hands any further without injuring him, a hand is not going to be opened up any further." On June 13, 1984, Judge O'Brien denied plaintiff's motion to vacate.

On April 22, 1985, defendants motioned for an independent Rule 215 examination. The motion requested that Saul be submitted for a CT scan of the head and that a small amount of blood be drawn, not to exceed 10 milliliters. The motion was heard by Judge Bosco, who entered an order on June 3, 1985, requiring Saul to submit to a CT scan and a physical examination, but denying the request for the blood sample. Counsel for one of the defendants asked whether his own expert could conduct a separate examination of plaintiff on the same date; however, Judge Bosco denied that request, stating "[t]here's going to be one exam [and] [i]t's going to be by someone that all of you people agree on." Accordingly, Judge Bosco's order provided in part:

> "At such examination, physicians selected by defendants other than Northwestern may be present, however, only one physician is authorized to examine the plaintiff and no further examinations are authorized."

The physical examination authorized by Judge Bosco's order was performed on July 18, 1985, by Michael Painter, M.D., a pediatric neurologist. Dr. Painter stated that, based upon his examination, he considered Saul to be congenitally malformed and that Saul's condition might be genetic. On September 9, 1985, the CT scan was performed by Thomas Naidich, M.D., a pediatric neuroradiologist. In his radiology consultation report, Dr. Naidich noted that the scan was performed without sedation, and as a result, the quality of the scan was diminished.

On January 26, 1986, defendants requested another physical ex-

amination, this time to be performed by a medical geneticist. In support of their motion, defendants submitted the affidavit of John Opitz, M.D., a medical geneticist. Dr. Opitz stated that he had to physically examine Saul in order to ascertain whether Saul suffers from a genetic defect. On April 7, 1976, Judge Nicholson denied defendants' motion without prejudice for a physical examination. Judge Nicholson stated that the motion sought to vacate, reconsider or modify Judge Bosco's order of June 3, 1985. However, Judge Nicholson also stated that, although she wouldn't "review" Judge Bosco's decision, defendants could "take it over to Judge Bosco." Defendants then refiled the motion before Judge Bosco.

On May 6, 1986, Judge Bosco ordered the requested examination, but stayed enforcement of the order and set the matter for further hearing on the issue of whether such an examination would be detrimental to the physical or mental well-being of Saul. Plaintiff moved to vacate the May 6, 1986, order, arguing that further examination was precluded by Judge Bosco's order of June 3, 1985. On June 25, 1986, Judge Bosco denied plaintiff's motion to vacate and ordered plaintiff to submit to a physical examination by Dr. Opitz.

On August 25, 1988, plaintiff deposed Dr. Naidich, who performed the 1985 CT scan on Saul. Dr. Naidich testified that he reviewed the 1985 CT scan films of Saul just prior to the taking of the deposition and saw "certain features of this study that I did not see until this morning that I believe require further investigation." He further testified that there was evidence "highly suggestive" of a condition known as schizencephaly, a congenital malformation of the brain generally attributed to events during the second month of gestation "that [was] not mentioned in the report because in 1985, I did not know enough about it to appreciate it." Dr. Naidich explained that he learned to recognize schizencephaly as a result of his participation in a medical study of the condition. Dr. Naidich stated that subsequent to the study, the methods of diagnosis of schizencephaly had improved: "We learned new things about schizencephaly that are simply not in the literature as yet."

Dr. Naidich testified that the CT scan images were of poor quality because Saul was not sedated during the procedure. Saul was moving during the procedure, the result of which was a "motion artifact" which obscured the area where Dr. Naidich saw evidence "strongly suggestive of possible schizencephaly." Dr. Naidich testified that if the CT scan was motion-free, he could make a diagnosis, "yes or no, as to the presence of closed lip schizencephaly." Dr. Naidich also testified that it would be necessary to sedate Saul in order to guarantee a motion-free scan.

On February 3, 1989, based upon the deposition of Dr. Naidich, defendants filed a new motion for a CT scan to be performed under sedation. The motion was first argued on April 11, 1989, before Judge Durham. Judge Durham noted plaintiff's argument that the requested examination was inconsistent with Judge Bosco's order of June 3, 1985, and acknowledged that he was limited in overruling a prior discretionary order by another judge. However, Judge Durham inquired whether Judge Bosco's order was based upon the same information that was before Judge Durham. Defense counsel advised Judge Durham that the information presented to Judge Bosco did not include the recent developments in the diagnosis of schizencephaly of which Dr. Naidich spoke.

After concluding that he was presented with new information not available to Judge Bosco in 1985, Judge Durham next considered the issue of safety. Judge Durham stated: "If [defendants] can show me by affidavit or by competent expert witnesses that the procedure can be done safely or the safeguards of the child's body can be protected, I'll grant [the] motion but not until [they] can show me." Likewise, Judge Durham told plaintiff that he could bring in counteraffidavits and "I'll make my decision based on that." The motion was then continued for further hearing on the issue of safety.

On April 17, 1989, defendants requested an emergency motion for a protective order preventing plaintiff's family or counsel from threatening litigation against any person or institution where MRI or CT scans are performed. In support of their motion, defendants stated that on April 12, 1989, plaintiff's attorney advised defense counsel that he intended to notify any individual or institution who might consider performing the CT scan that it would be subject to suit in the event plaintiff sustained any harm from it. On April 17, 1989, Judge Durham granted defendants' motion.

On May 15, 1989, Judge Durham conducted a further hearing on the safety of the requested CT scan under sedation. During the hearing, considerable time was devoted to a discussion of portions of a deposition given by Dr. Naidich. In his deposition, Dr. Naidich stated that while no medical procedure is 100% risk-free, chloral hydrate is a safe medication with minimal risks. Although Dr. Naidich stated that he could not assess the percentage of risk, he did state that the risks were "negligible." However, when asked whether he knew of any fatalities associated with the use of chloral hydrate, Dr. Naidich stated that, although he had no personal knowledge of any fatalities, he was sure that there were some.

In addition to the deposition, defendants submitted the affidavit

of Dr. Naidich, who recommended chloral hydrate in a dosage of 100 milligrams per kilogram of body weight, not to exceed 1,500 milligrams. Dr. Naidich stated that chloral hydrate is a medication routinely used to safely sedate premature infants, newborns, children with seizure disorders, and elderly adults. Dr. Naidich's affidavit concluded:

> "The risks associated with the use of chloral hydrate in [the] dosage [recommended] with cardiac and respiratory monitoring are minimal and specifically the risk of respiratory cessation is negligible. In my opinion the benefit ratio of chloral hydrate is best and *** Saul will not be exposed to any excessive risk."

For added safety, Dr. Naidich recommended that respiratory and cardiac monitors be used during the course of the MRI or CT scan.

In response, plaintiff submitted the affidavit of Roger Bird, M.D. Dr. Bird stated that schizencephaly is not a new disease entity. In addition, Dr. Bird identified the risks associated with chloral hydrate as including "disorientation, incoherence, ataxia, dizziness, gastric irritation manifested by nausea, vomiting and diarrhea, and cutaneous reactions such as allergic skin rashes." Dr. Bird identified other risks, including death, cardiac arrest, and respiratory system failure as being associated with the use of a toxic dose of chloral hydrate and chronic use of the sedative. Moreover, Dr. Bird stated that unless there are appropriate medical indications for the use of chloral hydrate, it is not medically justified or reasonable to submit a child to such risks.

In a second affidavit, Dr. Bird stated that it is impossible to determine in advance whether a particular individual will experience an adverse reaction to chloral hydrate. Although it is possible to identify individuals with elevated risks with respect to chloral hydrate, all individuals are at some degree of risk to the adverse effects of the sedative.

Plaintiff also submitted the affidavit of Lowell Zollar, M.D., who stated that "[a]ll sedated procedures involve some degree of risk to the patient"; and this risk must be weighed against the benefit to be derived by the procedure. According to Dr. Zollar, Saul will neither benefit from the procedure nor will the CT scan provide any information that would be necessary or helpful to Saul's medical management. Consequently, the procedure is not medically justified.

Additionally, plaintiff submitted the affidavit of John Lantos, M.D., stating that it was Dr. Lantos' opinion that the CT scan would be medically unethical and improper because there is no medical benefit to be derived by the plaintiff from the procedure. Dr. Lantos' rea-

soning is twofold. First, there is some risk to Saul that, even if it is assumed to be minimal, must be weighed against the medical benefits provided by the procedure, of which there are none. Thus, the risk is not ethically justified. Secondly, consent of the patient or his parents is required; since neither Saul nor his parents have consented, the procedure would be unethical, even if the procedure was entirely risk-free.

After reviewing the affidavits and hearing arguments, Judge Durham granted the motion and ordered that the CT scan should proceed. Judge Durham stated that plaintiff's affidavits were not helpful in that they did not "address what I asked them to. They don't give me any information *** about the risk of harm to this child."

In compliance with Judge Durham's directions, a draft order was submitted for review on July 18, 1989. At that time, the court was advised that arrangements had been made for the CT or MRI procedure to be performed by Glenn Geremiah, M.D., at Rush-Presbyterian-St. Luke's Medical Center. The court signed the order granting defendants' motion for the CT scan. The order specified that a "clinically necessary" dosage of chloral hydrate would be used to sedate Saul prior to the CT scan.

Plaintiff then filed suit against Rush-Presbyterian-St. Luke's Medical Center and Dr. Geremiah on July 21, 1989, seeking a temporary restraining order and a preliminary and permanent injunction to prevent the procedure from being performed. Judge Dunne dismissed the action without prejudice on the ground that the litigation pending before Judge Durham already had addressed the same issues. Two days later, Judge Durham denied plaintiff's motion to reconsider Judge Dunne's order.

On July 26, 1989, the date upon which the CT scan was to be administered, Saul's mother and attorneys did not submit him for the CT scan. Accordingly, Judge Durham entered a contempt order against them; it is from these orders that contemnors appeal.

Contemnors argue that the circuit court erred in ordering the MRI or CT scan to be performed under sedation where the sedative would pose a risk of harm to Saul. Specifically, they argue that the court itself acknowledged the risk of death. In ordering the CT scan, the court had, in essence, forced Saul to make the choice between risking his life or withdrawing his lawsuit.

■ Pursuant to Illinois Supreme Court Rule 215, the court in which a claim for personal injuries is pending may within its discretion order the plaintiff to submit to a physical exam. The constitutionality of a statute granting a court the discretionary power to order a

physical exam of the plaintiff was upheld in *People ex rel. Noren v. Dempsey* (1957), 10 Ill. 2d 288, 139 N.E.2d 780. That court stated:

"Strong feelings as to the 'inviolability of the person' [citation] may have been tacitly responsible [for the earlier rule that a court may not require a plaintiff to submit to physical examination]. But when one seeks to recover damages on the basis of his physical injuries he puts his physical condition in issue." 10 Ill. 2d 288, 292-93, 139 N.E.2d 780.

See also *People ex rel. Aldworth v. Dutkanych* (1986), 112 Ill. 2d 505, 493 N.E.2d 1037.

As to the more difficult question of whether a court is within its discretion to order a physical examination which may injure the plaintiff, no authority in Illinois exists, and a review of the standards and criteria in other jurisdictions is in order.

In support of their position that any examination which poses a risk of harm to a plaintiff must be denied, contemnors cite several cases from other jurisdictions. *Lefkowitz v. Nassau County Medical Center* (1983), 94 A.D.2d 18, 462 N.Y.S.2d 903; *Duprey v. Wagner* (1982), 186 N.J.Super. 81, 451 A.2d 416; *McQuillen v. City of Sioux City* (Iowa 1981), 306 N.W.2d 789.

In *Lefkowitz*, the trial court ordered the plaintiff to undergo a hysterosalpingogram, a fertility test involving X-ray examinations of the uterus and fallopian tubes after injection of a radiated opaque medium. (*Lefkowitz v. Nassau County Medical Center*, 94 A.D.2d at 19, 462 N.Y.S.2d at 905; see also *Duprey v. Wagner* (1982), 451 A.2d 416.) In response to the order, the plaintiff offered the affidavit of a board-certified gynecologist who concluded that while there was significant risk to the plaintiff, the test would not necessarily be conclusive. (*Lefkowitz v. Nassau County Medical Center*, 94 A.D.2d at 19, 462 N.Y.S.2d at 905.) The only proof in opposition to the gynecologist's affidavit was "conclusory statements of the county defendants' counsel" which the court held were valueless because of defendant counsel's lack of qualifications to render a medical opinion. *Lefkowitz v. Nassau County Medical Center*, 94 A.D.2d at 21, 462 N.Y.S.2d at 906.

The reviewing court in *Lefkowitz* found that although the plaintiff placed her physical condition in controversy when she commenced the lawsuit, an examination would not be ordered if it presented the possibility of danger to the plaintiff's life or health. (*Lefkowitz v. Nassau County Medical Center*, 94 A.D.2d at 21, 462 N.Y.S.2d at 906.) The court held that in determining whether the examination should be ordered, the plaintiff must meet the burden

of showing that the examination in question is *prima facie* dangerous. If the plaintiff meets her burden, the burden then shifts to the defendant to demonstrate the safety of the proposed examination. (*Lefkowitz v. Nassau County Medical Center*, 94 A.D.2d at 21, 462 N.Y.S.2d at 906.) Although the degree and type of proof necessary to show safety may vary, the party seeking the exam generally is required to offer the affidavit of an expert or at least cite from standard medical texts. *Lefkowitz v. Nassau County Medical Center*, 94 A.D.2d at 21, 462 N.Y.S.2d at 906.

The *Lefkowitz* court held that the plaintiff had met her burden, whereas the defendant had failed to demonstrate the test's safety. (*Lefkowitz v. Nassau County Medical Center*, 94 A.D.2d at 22, 462 N.Y.S.2d at 906.) Accordingly, the court denied the examination. *Lefkowitz v. Nassau County Medical Center*, 94 A.D.2d at 22, 462 N.Y.S.2d at 906.

■ Although contemnors rely upon *Lefkowitz* in the instant case, if the reasoning applied in *Lefkowitz* were adopted by this court, defendants would prevail. The deciding factor in *Lefkowitz* was the defendant's failure to meet his burden to present evidence showing the safety of the examination. Here, defendants have offered several affidavits attesting to the safe, routine use of chloral hydrate. Moreover, each of the affidavits presented offered the opinions of qualified medical professionals. Although plaintiff may have met his burden showing that the proposed sedation was *prima facie* dangerous, defendants have indeed demonstrated the safety of chloral hydrate. Dr. Naidich has attested to the safe, routine use of chloral hydrate in premature infants, newborns, children with seizure disorders, and elderly adults.

Another case upon which contemnors rely is *McQuillen v. City of Sioux City* (Iowa 1981), 306 N.W.2d 789. There the defendant sought to subject the plaintiff to an arteriography, a test which involves a heart catheterization and the injection of a radionuclide. Although conceded to be an unusual procedure, medical testimony assessed the risk to the plaintiff's life and health to be less than $1\frac{1}{2}\%$. (*McQuillen v. City of Sioux City*, 309 N.W.2d at 791.) That statistic persuaded the court, on balance, to order the plaintiff to submit to the procedure. *McQuillen v. City of Sioux City*, 306 N.W.2d at 791.

Like the defendants in the instant case, the *McQuillen* defendant offered proof that the test was the only remaining diagnostic technique and that it was relatively safe. The *McQuillen* court stated that the issue required a weighing of the risk to the plaintiff against the need for the test results. (*McQuillen v. City of Sioux City*, 306

N.W.2d at 791.) Because it was not shown that the plaintiff would have a particular susceptibility to risk in the procedure, the balance weighed in favor of conducting the test. *McQuillen v. City of Sioux City*, 306 N.W.2d at 791.

Although plaintiff offered affidavits of experts propounding on the risks associated with chloral hydrate in general, no evidence was submitted to show that Saul would have a particular susceptibility to the sedative. Although Dr. Naidich admitted that no sedation was entirely safe, he also stated that the risk of the sedative chloral hydrate was "negligible" and "very small." Even though Dr. Naidich did not offer a percentage of risk as the expert in *McQuillen* had done, Dr. Naidich did state that the risk was "negligible" and that the use of chloral hydrate was "routine" even in cases involving infants and children with seizures. Thus, the evidence presented by Dr. Naidich did support a finding that the CT scan could be performed safely with chloral hydrate.[2]

A recent New York case addressed the precise issue which this court now faces. (*Langelier v. Ford* (1990), 159 A.D.2d 851, 552 N.Y.S.2d 992.) In *Langelier*, an infant with severe developmental defects sued his pediatrician. The trial court granted the defendant's motion to direct a physical examination, including a MRI or CT scan under sedation, of the infant and an evidentiary hearing was ordered on the issues concerning the need for the tests and the risks posed by the tests. It was conceded in *Langelier* that the CT scan was benign, but the sedation posed a theoretical risk to someone with the infant's disabilities.[3] (*Langelier v. Ford*, 159 A.D.2d at 852, 552 N.Y.S.2d at 993.) The court applied the standard enunciated in *Lefkowitz*:

> "Once the opponent of the test shows 'that the test is prima facie potentially dangerous ***' the burden shifts to the proponent to present 'proof "showing the necessity for such examination, the details of the procedure employed in making it, the frequency with which it has been done, together with the experience and observations which have been made by physicians as to pain [or] harm."'' [Citations.]" *Langelier v. Ford*, 159 A.D.2d at 852, 552 N.Y.S.2d at 993.

---

[2]Although contemnors argue that the court placed undue emphasis on the testimony of a "partisan" expert, no evidence exists in the record which shows that Judge Durham gave more weight to defendants' experts than plaintiff's experts. If anything, it is clear that Judge Durham gave equal weight to all the testimony assessing the risks of chloral hydrate.

[3]The *Langelier* court did not specify the type of sedative to be used on the infant plaintiff.

The court held that the plaintiff did make a *prima facie* showing that the sedative was dangerous. (*Langelier v. Ford*, 159 A.D.2d at 853, 552 N.Y.S.2d at 994.) Nevertheless, the court ordered the test because the plaintiff's expert established that the risk of life-threatening complications was only 1%, the complications were reversible with proper treatment, and the order directed that proposed safety measures be employed. *Langelier v. Ford*, 159 A.D.2d at 853, 552 N.Y.S.2d at 994.

In the instant case, although Dr. Naidich did not testify to the percentage of risk, he nevertheless stated that the risks of life-threatening complications were "negligible." Additionally, Dr. Naidich testified that, if a CT scan done with sedation were given, he could tell definitively whether or not Saul suffers from congenital schizencephaly.

Despite Dr. Naidich's attestations to the safety of chloral hydrate, contemnors maintain that the CT scan should not be performed because of the risk to Saul. They argue that any risk, however small, must be weighed against the medical benefit to be derived by Saul. Here, because Saul would derive no medical benefit from the CT scan, contemnors argue that the risk of harm, however slight, mandates that the examination not be performed.

Contemnors are mistaken, however, in their contention that this court must consider the medical benefit to be derived from the examination. Although such a consideration may be necessary in the medical profession, the examination proposed is a Rule 215 examination and is thus legal, not medical, in nature. By definition, a Rule 215 examination is not performed for the patient's benefit; rather, a Rule 215 examination is a legal discovery device. Accordingly, contemnors' argument that Saul would not benefit from the examination is meritless. Moreover, their argument that neither Saul nor his parents have consented to the examination and, as such, the examination must be denied, is equally meritless. Again, Rule 215 examinations are neither based upon the benefit derived by plaintiff nor contingent upon plaintiff's consent.

At issue here is not whether Saul would receive a benefit from the examination nor whether Saul has consented to the examination, but rather whether the risk posed by the Rule 215 examination outweighs the benefit to justice. Ultimately, Judge Durham did consider the risk to Saul and found that the risk did not compel the denial of the examination. As Judge Durham pointed out, plaintiff did not offer any evidence as to the risk of harm to Saul. Defendants, however, did offer evidence that the examination under the proposed

sedation created a "negligible" risk to Saul.

■ We adopt the rationale enunciated in the *Lefkowitz* decision and hold that when a plaintiff contends that a Rule 215 examination presents the possibility of danger, he must meet the burden of showing that the proposed examination is *prima facie* dangerous. If the plaintiff meets his burden, the burden then shifts to the defendant to demonstrate the safety of the proposed examination.

■ In the instant case, defendants have met their burden of showing that the proposed examination is safe. Accordingly, we will not reverse the court's order allowing the examination.

■ Contemnors argue further that Judge Durham abused his discretion in "reversing" the decision of a predecessor judge. However, that argument must necessarily fail. The Illinois Supreme Court stated in *Balciunas v. Duff* (1983), 94 Ill. 2d 176, 446 N.E.2d 242, that a successor judge should not modify previous discovery rulings unless "there is a change of circumstances or additional facts which warrant" a modification of a prior order. (*Balciunas v. Duff*, 94 Ill. 2d at 188.) This is to prevent "judge shopping." *Balciunas v. Duff*, 94 Ill. 2d at 188.

■ However, in the instant case, "changed circumstances" did indeed warrant a modification of a prior order. According to Dr. Naidich's deposition, between 1985 and 1989, medical advances took place in the diagnostic methods of determining schizencephaly.[4] Moreover, the order which contemnors claim cannot be modified (that of June 3, 1985, ordering "no further exams") was itself modified by its original drafter, Judge Bosco, on May 6, 1986, when Judge Bosco ordered a physical examination by a medical geneticist.

■ Contemnors also argue that because Saul is a minor, the court must afford him greater protections from discovery rulings. Contemnors offer no cases which support such a proposition. Although they cite *Burton v. Estrada* (1986), 149 Ill. App. 3d 965, 501 N.E.2d 254, that case is inapposite to the instant case.

■ Contemnors finally argue in their reply brief that the order as written should not be enforced because it does not specify the dosage of the chloral hydrate nor does it set forth the qualifications of the physician and hospital who will administer the test. Contemnors maintain that the order should have included a specific dosage of chloral hydrate, names of physicians who will perform the CT scan, and

---

[4]Contemnors also argue that the second requested CT scan would be cumulative. However, due to the change in circumstances and the defects in the first CT scan, their argument must fail.

the types of precautions to be taken in the event of emergency. We agree and remand the order to the circuit court so that it can be modified to conform to those requirements. The order must specify the dosage of chloral hydrate to be administered, the names of physicians who will perform the CT scan, and the precautions to be taken in the event of an emergency.

■■ Finally, the *amici curiae*[5] brief addresses several issues which the contemnors do not raise in their briefs. More specifically, the *amici curiae* argue that the imposition of the CT scan under sedation is an unconstitutional infringement of Saul's rights. Here, the *amici curiae* rely upon three separate lines of authority, beginning with a discussion of early Federal cases addressing the propriety of physical examinations before the adoption of what is now Federal Rule 35, then turning to a discussion of cases involving the constitutional right of privacy, then to cases applying the due process clause and the fourth amendment to criminal prosecutions. However, each of these lines of authority is inapplicable to the present circumstances and the arguments based upon them are without merit.

In light of the above, we conclude that Judge Durham did not abuse his discretion when he weighed the evidence of the risks of chloral hydrate and granted defendants' motion to compel Saul to submit to a CT scan under sedation. However, the order must be made more specific as to the dosage, names of physicians, and safety measures employed in performing the CT scan. Thus, we remand to the circuit court for further proceedings consistent with this opinion. In so ruling, we vacate the contempt order and the fines assessed against contemnors.

Affirmed in part and reversed in part and remanded.

WHITE and SCARIANO, JJ., concur.

---

[5]The *amici curiae* consist of: The Illinois Trial Lawyers Association, Alliance Against Intoxicated Motorists, Trial Lawyers for Public Justice, and The Association of Trial Lawyers of America.