Enrique PENA and Ignacia Guadalupe Pena, individually and as the next friends and parents of Raquel Pena, a minor, Plaintiff,

v.

William R. TROUP, M.D., Defendant.

Civ. A. No. 94–M–1393.

United States District Court, D. Colorado.

June 22, 1995.

Sander N. Karp, Denver, CO, Tim Hoffman, J.E. Sauseda, Jr., Amarillo, TX, for plaintiff.

Kay J. Rice, Rebecca L. Crotty, Denver, CO, for defendant.

## ORDER

ABRAM, United States Magistrate Judge.

This matter comes before the Court regarding Defendant's Motion for Independent Medical Examination, Defendant's Motion for Extension of Time to Endorse Expert Witnesses to Testify Regarding Causation, and Plaintiffs' Motion for Protective Order. Magistrate Judge D.E. Abram hereby makes the following orders.

## I. FACTS

Plaintiffs brought this action claiming that Raquel Pena incurred severe neurological injuries and brain damage as a result of Defendant's negligence during her delivery.

On January 5, 1995, a Magnetic Resonance Imaging scan ("MRI") was attempted on Raquel. Because Raquel could not remain still during the MRI, her movement obscured the image and prevented an accurate assessment of the study. Subsequently, Defendant filed this motion requesting the Court to order that Raquel submit to another MRI, this time under sedation or general anesthesia, as determined by the anesthesiologist monitoring the scan. Defendant argues that, with the aid of an MRI, a specially trained physician may be able to tell from the pattern of brain injury whether the damage occurred at birth, as Plaintiffs allege, or during the pregnancy from causes unrelated to the care given by Defendant.

Plaintiffs object to Defendant's request on the grounds that the procedure poses substantial risks of harm to Raquel and because Defendant has failed to sufficiently state good cause for the procedure.

## II. RELEVANT LAW

Upon motion for good cause shown, the court may order a party—whose mental or physical condition is at issue in a case—to submit to a physical or mental examination.

Fed.R.Civ.P. 35(a). "In determining what kinds of examinations to authorize, the court must balance the desire to insure the safety and freedom from pain of the party to be examined against the need for the facts in the interest of truth and justice." 8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2235, at 494 (2d ed. 1994).

■ Here, the Court must decide whether to order Plaintiffs to submit to a procedure which they deem to be unsafe. Although this is a question of first impression in this court, several other courts have addressed the issue. These courts have adopted the "burden-shifting" approach articulated in *Lefkowitz v. Nassau County Medical Center,* 94 A.D.2d 18, 462 N.Y.S.2d 903 (1983). In *Lefkowitz,* plaintiff claimed that she became infertile because of defendant-physician's alleged negligence. Defendants requested that plaintiff submit to medical testing which was potentially dangerous. *Id.* 462 N.Y.S.2d at 905–906. In resolving this dilemma, the court adopted a burden-shifting approach, requiring plaintiff to show that the proposed test is *prima facie* potentially dangerous. *Id.* 462 N.Y.S.2d at 906. Once plaintiff satisfies this initial burden, the burden shifts to the party seeking the examination to demonstrate the need for the examination and its safety. *Id.* "Although the degree and type of proof necessary to show safety may vary from case to case, the seeking party generally is required to offer the affidavit of an expert or at least to cite from standard medical texts of which judicial notice could be taken." *Id.* Because defendants had not supplied such documentation to the court in *Lefkowitz,* the court held that defendants failed to meet their burden. *Id.*

In *Langelier v. Ford,* 159 A.D.2d 851, 552 N.Y.S.2d 992 (3 Dept.1990), the New York court again applied the *Lefkowitz* test to facts analogous to the instant case. In *Langelier,* plaintiff sued the hospital where her son was born alleging malpractice in the failure to properly and timely diagnose and treat the infant. *Id.* 552 N.Y.S.2d at 993. Defendant moved for an order compelling plaintiff to submit to an MRI under sedation,

and plaintiff objected. First, the court determined that plaintiff met the initial burden of establishing a theoretical risk. *Id.* 552 N.Y.S.2d at 994. The court went on to conclude that, in light of expert testimony that the risk to plaintiff was minimal, the defendant met its burden. Therefore, plaintiff was ordered to submit to the MRI.

Another case from New York also bears similarity to the instant case. *See Thomas v. John T. Mather Memorial Hosp.*, 162 A.D.2d 521, 556 N.Y.S.2d 720 (2 Dept.1990). In *Thomas*, defendants sought to compel the severely brain-damaged plaintiff to submit to an MRI or a Computed Axial Tomography ("CAT") scan while under sedation. Plaintiff sought a protective order on the ground that plaintiff's health would be endangered if he were compelled to submit to the scan while under sedation. Plaintiff's neurologist submitted an affidavit stating that "there is no medical reason or medical benefit for [the plaintiff] to undergo a C[A]T scan. Clearly anesthesia or sedation (including chloral hydrate) does represent a risk to [his] health." *Id.* 556 N.Y.S.2d at 721. In turn, defendants established that the risk to plaintiff was minimal and that plaintiff had submitted to CAT scans while sedated on previous occasions without consequence. *Id.* The court ordered plaintiff to submit to the scan and explained its decision as follows:

> Notwithstanding the plaintiff's assertions to the contrary, there is a need as well as a benefit to be derived from the CAT scan, since it may enhance the defendants' ability to prepare a defense. Indeed, the functional utility of such an exam and its validity as a discovery device is not in dispute. We note, moreover, that the plaintiff's expert offered no details as to the manner in which chloral hydrate would be harmful to the plaintiff nor did he address the fact that the plaintiff apparently tolerated several prior CAT scans without incident. *Id.*

Other jurisdictions have employed analogous reasoning. On two occasions, Illinois has considered whether to compel plaintiff to submit to an MRI under sedation. In the first case, plaintiff claimed that, due to the negligence of defendant hospital and pediatricians, he suffered from brain damage allegedly sustained during his birth. *Sarka v. Rush Presbyterian–St. Luke's Med. Ctr.*, 207 Ill.App.3d 587, 152 Ill.Dec. 614, 615, 566 N.E.2d 301, 302 (1 Dist.1990), *cert. denied*, 139 Ill.2d 604, 159 Ill.Dec. 116, 575 N.E.2d 923 (1991). After an initial scan proved to be of poor quality because plaintiff could not remain still, defendant moved to compel plaintiff to undergo a second scan while under sedation. Plaintiff submitted affidavits from three physicians who described the risks associated with the procedure and agreed that "it is not medically justified nor reasonable to submit a child to such risks." *Id.* 152 Ill.Dec. at 616–617, 566 N.E.2d at 304–305. Defendants' expert stated that the risks associated with the procedure were minimal and that sedation was routinely used on children with seizure disorders. *Id.* Because defendants demonstrated that the risk was negligible and the procedure was routinely performed on children with seizures, the court compelled plaintiff to submit to the scan. *Id.* 152 Ill.Dec. at 620, 566 N.E.2d at 309.

In another case, however, the Illinois court held that plaintiff could not be compelled to undergo an MRI while under sedation. *See Stasiak v. Illinois Valley Community Hosp.*, 226 Ill.App.3d 1075, 169 Ill.Dec. 55, 590 N.E.2d 974 (3 Dist.1992). The court distinguished *Stasiak* from *Sarka* because the defendants in *Stasiak* did not demonstrate that the plaintiff's existing medical records were incomplete, that the MRI would provide additional necessary evidence, or that the MRI would resolve any major legal issue. *Id.* 169 Ill.Dec. at 59, 590 N.E.2d at 978. Therefore, defendants did not meet their burden to compel plaintiff to undergo a procedure which was not without risk.

Likewise, defendants can not meet this burden absent affidavits or other evidentiary support demonstrating the safety of the proposed examination. *State v. Zakaib*, 189 W.Va. 616, 433 S.E.2d 554 (1993). Because defendants did not supply the court with such information, the court could not compel plaintiff to submit to an MRI under sedation. *Id.* 433 S.E.2d at 559.

## III. APPLICATION OF THE LAW TO THIS CASE

The Court agrees with the jurisdictions which have adopted the *Lefkowitz* burden-shifting approach to decide cases such as this one. Under that standard, Plaintiffs must first demonstrate that it is *prima facie* potentially dangerous for Raquel to submit to the MRI under sedation or general anesthesia. Plaintiffs assert that the procedure poses substantial risk of harm to Raquel. See Plaintiffs' Motion for Protective Order and Response to Motion for Independent Medical Examination, ¶ 4. Plaintiffs have furnished the Court with two affidavits. In the first affidavit, Dr. J.H. Isern, a Board certified anesthesiologist, opines:

> [I]t would be a breach of good medical practice to subject Raquel Pena to the risks of general anesthesia in order to perform an MRI as there is no sound basis to conclude such a study is necessary to the improvement of her underlying disease or overall general health.... [General anesthesia] carries inherent risks including death, brain damage, paralysis, spinal injury, respiratory problems, adverse drug reaction, injury to vocal cords, loss of vision, and varying degrees of physical pain. Those risk[s] are at least the same if not greater for Raquel Pena because of her cerebral palsy and the difficulties that condition could pose to the sedation itself in terms of intubation, positioning and monitoring. There is also the possibility of an adverse reaction between anesthetic agents and her anticonvulsant medications.

Exhibit 1 to Plaintiffs' Motion for Protective Order and Response to Motion for Independent Medical Examination. In the second affidavit, Dr. Rush Snyder, who has been Raquel's neurologist since February 21, 1983 states that "the risks of general anesthesia are unacceptable for this patient." Exhibit 2 to Plaintiffs' Motion for Protective Order and Response to Motion for Independent Medical Examination. Based on these affidavits, Plaintiffs have demonstrated that general anesthesia is *prima facie* potentially dangerous for Raquel.

Because Plaintiffs have satisfied their burden, the burden shifts to Defendant to demonstrate the need for the MRI and its safety. Plaintiff argues that a CAT scan performed on Raquel in 1977, a few months after her birth, should be sufficient to meet Defendant's needs. Plaintiffs' Motion for Protective Order and Response to Motion for Independent Medical Examination, ¶ 14. However, due to the age of the film, the CAT scan is not available because it has been recycled by the hospital. See Exhibit B, ¶ 4 to Defendant's Reply in Support of Motion for Extension of Time to Endorse Expert Witnesses to Testify Regarding Causation. Although a radiologist's report documenting the 1977 CAT scan exists, it makes no reference as to the timing or the cause of Raquel's injury. See Exhibit C to Defendant's Reply in Support of Motion for Extension of Time to Endorse Expert Witnesses to Testify Regarding Causation. Moreover, even if the actual CAT scan were available, "it would not be helpful in this area because of the limitations of those scans and the images produced." Exhibit A, ¶ 4 to Defendant's Reply in Support of Motion for Extension of Time to Endorse Expert Witnesses to Testify Regarding Causation.

Defendant has submitted affidavits of two Board certified pediatric neurologists, Drs. Bradford Miller and Paul Levisohn, and a Board certified anesthesiologist, Dr. Bruce Brookens. See Exhibits B, C, and D to Defendant's Reply Brief Re: Request for Independent Medical Examination. All three doctors concur that an MRI will provide vital information to the assessment of Raquel's injury. An MRI would enable doctors "to determine the extent of the intracranial pathology and whether the pathology is static or progressive and whether it is developmental or acquired. If the pathology is progressive or developmental, it is not due to birth related injury." Exhibit C, ¶ 3 to Defendant's Reply Brief Re: Request for Independent Medical Examination. Clearly, Defendant needs the MRI to aid in determining a critical issue in the case—causation.

Defendant has also met his burden of showing that the risks associated with the procedure are minimal to Raquel. Dr. Levisohn opines that "an MRI is the medically accepted test of choice for imaging the cen-

tral nervous system and is an extremely safe procedure.... While no medical procedure is 100% risk free, I believe Raquel can be sedated for the procedure with minimal risk." Exhibit C, ¶¶ 4–5 to Defendant's Reply Brief Re: Request for Independent Medical Examination.

Dr. Brookens agrees: "An MRI can be performed safely under sedation or general anesthesia for patients such as Raquel Pena, especially if monitored by an anesthesiologist.... Sedation or general anesthesia for any patient (including Raquel Pena) involves some potential risk; however, in my professional opinion, the risk is low." Exhibit D, ¶¶ 5, 8 to Defendant's Reply Brief Re: Request for Independent Medical Examination. Dr. Brookens also attached several medical articles supporting his opinion, including an article specifically addressing epileptic patients. This article found no significant change in epileptiform activity in patients who were subjected to a relatively new intravenous anesthetic called Propofol. *See* Satwant K. Samra et al., *Effects of Propofol Sedation on Seizures and Intracranially Recorded Epileptiform Activity in Patients with Partial Epilepsy,* 82 Anesthesiology 843 (April 1995). Finally, it is important to highlight that, in formulating his opinion, Dr. Brookens noted that, on June 4, 1992, Raquel had general anesthesia for a dental cleaning and restorations and had no complications from the anesthesia. "This history shows she can undergo anesthesia safely." Exhibit D, ¶ 9 to Defendant's Reply Brief Re: Request for Independent Medical Examination.

In light of the above evidence, Defendant has met his burden of showing the necessity for the MRI and the minimal risk associated with the procedure. Therefore, Plaintiffs should be compelled to submit Raquel to the MRI. *See Stinchcomb v. United States,* 132 F.R.D. 29, 31 (E.D.Pa.1990) ("It would not be fair to permit a plaintiff to rely on the very condition of which he complains to defeat a defendant's ability to prove that he did not cause that condition.").

Defendant agrees that the MRI can be performed in Texas—where Plaintiffs reside—by a radiologist and an anesthesiologist of Plaintiffs' choosing, that the mode of sedation or anesthesia be determined by the anesthesiologist, that Raquel's treating physician may supervise the MRI, and that Raquel's parents may be present during the procedure. Defendant's Motion for Independent Medical Examination, ¶ 4; Defendant's Reply Brief Re: Request for Independent Medical Examination, ¶ 23. Defendant also agrees to pay the costs incurred for the MRI. Defendant's Motion for Independent Medical Examination, ¶ 4.

IT IS ORDERED THAT Defendant's Motion for Independent Medical Examination is hereby granted consistent with this Opinion, to be performed on or before July 31, 1995. Plaintiffs have until July 14, 1995 to select and designate the time and location of the MRI, and the radiologist and anesthesiologist who will perform the MRI. In the event that Plaintiffs do not select and designate the above particulars on or before July 14, 1995, Defendant may determine these particulars and conduct the MRI on or before July 31, 1995.

IT IS FURTHER ORDERED THAT Plaintiffs' Motion for Protective Order is hereby denied.

IT IS FURTHER ORDERED THAT Defendant's Motion for Extension of Time to Endorse Expert Witnesses to Testify Regarding Causation is hereby granted.